Parker, C. J.,
delivered the opinion of the Court. Respectable counsel having expressed doubts upon the point reserved in this case, and having also suggested an opinion that the action was of a nature to bo discountenanced rather than favored, we have given more *11 consideration to the case than our impression of the merits of the objections would have required.
We can conceive of no more suitable ground of application to , the tribunals of justice for compensation, than that of a violated promise to enter into a contract, on the faithful performance of which the interest of all civilized countries so essentially depends When two parties, of suitable age to contract, agree to pledge their faith to each other, and thus withdraw themselves from that inter course with society which might probably lead to a similar connection with another, —the affections being so far interested as to rendei a subsequent engagement not probable or desirable, — and one of the parties wantonly and capriciously refuses to execute the contract which is thus commenced, the injury may be serious, and circumstances may often justify a claim of pecuniary indemnification.
When the female is the injured party, there is generally more reason for a resort to the laws than when the man is the sufferer. Both have a right of action, but the jury will discriminate and apportion the damages according to the injury sustained. A deserted female, whose prospects in life may be materially affected by the treachery of the man to whom she has plighted her vows, will always receive from a jury the attention which her situation requires ; and it is not disreputable for one, who may have to mourn for years over lost prospects and broken vows, to seek such compensation as the laws can give her. It is also for the public interest, that conduct tending to consign a virtuous woman to celibacy, should meet with that * punishment which may prevent it from becoming common. That delicacy of the sex which, happily, in this country gives the man so much advantage over the woman, in the intercourse which leads to matrimonial engagements, requires for its protection and continuance the aid of the laws. When it shall be abused by the injustice of those who would take advantage of it, moral justice, as well as public policy, dictates the propriety of a legal indemnity.
This is not a new doctrine. As early as the time of Lord Holt, it was enforced, as the common law, by that wise and learned judge and his brethren, that a breach of promise of marriage was a meritorious cause of action ; (2) and although the value of a marriage in money might have had some influence in that decision, there is no doubt that the loss sustained in other respects — the wounded spirit, the unmerited disgrace, and the probable solitude, which would be the consequences of desertion after a long courtship — were considered to be as legitimate claims for pecuniary compensation as *12 the loss of reputation by slander, or the wounded pride in slight assaults and batteries.
Nor is this English law become obsolete. It is the common law of our country, always recognized when occasions have offered; and the occasions have not been unfrequent since the adoption of our constitution. (3) In the case of Paul vs. Frazier, (4) Chief Justice Parsons says, “As the law now stands, damages are recoverable for a breach of promise of marriage.” Several actions of this nature have been before this Court since I have been upon the bench; and I remember several, when I was in practice at the bar, m which I was counsel. Indeed, there is no country, in which the relative situation of the sexes, and their joint influence on society, would render such a principle of jurisprudence more useful or necessary.
As to the technical ground upon which the objection to the verdict now rests, we entertain no doubts. The exception taken is, that there was no direct evidence of an express promise of marriage made by the defendant. The * objection implies that there was indirect evidence from which such a promise may have been inferred ; and the jury were instructed that if, from the letters written by the defendant, as well as his conduct, they believed that a mutual engagement subsisted between the parties, they ought to find for the plaintiff. They made the inference, and without doubt it was justly drawn.
Is it, then, necessary that an express promise in direct terms should be proved? A necessity for this would imply a state of public manners by no means desirable. That young persons of different sexes, instead of having their mutual engagements inferred from a course of devoted attention and apparently exclusive attachment, which is now the common evidence, (a) should be obliged, before *13 they considered themselves bound, to call witnesses, or execute instiumenis under hand and seal, would be destructive of that chaste and modest intercourse which is the pride of our country; and a boldness of manners would probably succeed, by no means friendly to the character of the sex or the interests of society.
A mutual engagement must be proved, to support this action ; but it may be proved by those circumstances which usually accompany such a connection. No case has been cited in support of the defendant’s objection. On the contrary, it is very clear, from all the English cases, that a promise may be inferred, and that direct proof is not necessary. In the case before referred to, of Hutton vs. Man sell, Lord Holt says expressly, that, where one has promised, and the behavior of the other is such as to countenance the belief that an engagement has taken place, this is evidence enough of a promise on the part of the person so conducting ; and the same principle will apply to both the parties.
*14 In the present case, however, the evidence on which the jury relied was of a decisive nature; for the letters of the defendant, which were submitted to them, were couched in terms which * admit only of the alternative, that he was bound in honor and conscience to marry the plaintiff, or that he was prosecuting a deeply-laid scheme of fraud and deception, with a view to seduction.. The jury believed the former; and in so doing have vindicated his character from the greater slain ; and he ought to be content with the damages which they thought it reasonable to assess for the lighter injury, (a)

Judgment on the verdict.

 3 Salk. 16, Hutton vs. Mansell.—2 Comyns on Contracts, 408.

 3 Mass. Rep. 189. Boynton vs. Kellogg.

 Ibid. 71.

 The language of the chief justice is very loose and indefinite, but he goes beyond all authority if he intended to say that mutual engagements to marry may be inferred merely from the course of devoted attention and apparently exclusive attachment. In Honeyman vs. Campbell, (5 Shaw & Wils. 144, 145. — 2 Dow Clark, 282,) the lord chancellor has very fully and accurately stated the law upon this subject. “ A promise, like all other acts,” he says, “ may be proved by two several ways, either by direct evidence, or by circumstantial evidence There may be direct evidence by the testimony of witnesses, who heard the promise given. There may be direct evidence in writing, proved to be the hand of the party giving it. But the promise, like all other facts, may be proved by circumstances. It may be proved without either witnesses to support it, or the hand-writing to remain on record against the party promising. Circumstances may be proved by evidence,—circumstances may be proved by the testimony of witnesses, or by written evidence, — and if those circum stances arc, sufficient to convince the court trying the question as a matter of fact that & vronnsv. did take place, the promise must be taken to have been made as much as if it Jiad been established by the other more direct and immediate proof; nay, sometime *13 circumstantial evidence is stronger and less liable to doubt than direct evidence, inasmuch as it is more difficult to make out a circumstantial case by curiously contrived perjury than a direct case by a witness, who may take a false oath to the fact. If I were at Nisi Prius, trying it with a jury, I should inform them that they must be sat isfied that there was a promise, a serious promise, intended as such by the person making it,'and accepted as such by the person to whom it was made. If the doctrine had been ventilated here, that courtship, or other circumstances showing an intention, nay, that an intention to marry, however strongly expressed and however plainly entertained, constituted what may be termed (borrowing an expression familiarly known to the Scotch lawyers) an equipollent to a promise, 1 should have taken leave to deny the proposition in point of law. The promise must be mutual; both parties must be bound; the marriage, ton bind one, must bind both; there is nothing more plain than the perpetual distinction between an intention to marry and a promise to marry. But courtship is a most material fact in the case when you are examining whether, from the conduct of the parties, it appears that a promise had actually passed between them. When persons are on the footing of lovers, when it is well known that love is usually followed by matrimony, that it is naturally incident to the relation of lovers to wish to be married, and that a long course of courtship can hardly have any other object than marriage in view, — though the intention to marry will not of itself supply the want of a promise, yet, in seeking for evidence of a promise, the long courtship and the intention make it extremely probable that the parties had received mutual promises of marriage. Therefore, if it stood alone as a mere question of probability, that would carry us a good way towards satisfying the jury that there was a courtship and a course of love-making, with a view, as it may generally be taken, to matrimony; otherwise, it is no courtship between the parties. This, however, would plainly not be enough." A promise on the part of the woman may be presumed from such circumstances of acquiescence, or tokens of approval, as ordinarily attend the acceptance of an offer of marriage — her presence when the offer was made, and the consent of parents asked without her making any objection ; her subsequent reception of the suitor’s visits and concurrence in the arrangements for the wedding; her carrying herself as one consenting and approving, for her consent in words is not necessary. — Roscoe Evid. 2d ed. p. 194, Daniel vs. Bowles. —2 Car. & 554, Hutton vs. Mansell. — 3 Salk. 16, 64. "But,” says Mr. Roscoe, "to prove a promise by a man, undoubtedly more would be necessary, neither the usages of society nor considerations of delicacy interfering to restrain an explicit declaration on his part.” — Roscoe, ubi sup. — A bill in equity for discovery of a promise to marry will lie in aid of an action at law. — Vaughn vs. Aldridge, For. 42. — Vide 6 Cowan, 254, Southard vs. Rexford.

 A promise of marriage was called by the Romans stipulatio sponsalia. The stipulation had this effect only by the jus antiquum of the Romans, that an action of damages lay against the party promising and refusing to perform.— Gell. Noct. Att. lib. 4, c. 4. — And when afterwards earnest, arrhce sponsalitice, came to be given by the bridegroom, he lost his earnest if he resiled; and if the bride resiled, she was obliged to restore it with as much more. — Lib. 5, c. De sponsal. — The canon law allows the party a liberty to resile, though he should have promised upon oath. Decret. lib. 4, tit. 1, c. 2, 17. In Holland, he who has entered into espousals, according to the law of that country, may, at the suit of the other party, be compelled to fulfil his engagement remediis prcetoris, by imprisonment, seizing his goods, &c.; and if he still con tinue obstinate, the judge may, by his sentence, declare the marriage perfected, the consent given in the espousals being, in such case, brought down jictione juris to the date of the sentence.— Brower, de jur. connub. p. 255. Vander Linden, p. 72. Voet ad tit. ff de sponsal, n. 12. — By the custom of Scotland, all promises of marriage, whether private or more solemn, contained in written contracts, may, in general, be resiled from, which proceeds from a close adherence to the rule matrimonia debent esse libera, and from the consideration of the fatal consequences which often attend forced marriages. — Ersk. Inst. b. 1, tit. 6, p. 513. — “ But," says Erskine, “ if we suppose matters not entire, that is, any thing done in consequence of the promise, whereby damage arises to any of the parties from the non-performance, the party refusing to fulfil, though he cannot be compelled to celebrate the marriage, may be condemned to pay the damage sustained by the other party.” And his annotator, Mr. Ivory, says, damages are now also given in solatium of the wounded feelings of the party, although no specific patrimonial damage be alleged. In France, Pothier says, " Parmi nous, 1’official doit se contentor des voies d’exhortation, et si la partie persiste dans son refus, il doit prononcer la dissolution des fianjailles, en lui imposant un penitence pour son manque de foi, qui consiste dans quelque priéres, ou légeres aumónes; ce manque de foi doit étre toléré comme un moindre mal pour éviter de plus grands maux que pourrait occasioner un mariage qui serait contráete par contrátate.” Poth. contr. du Mar. pt. 2, c. 1, n. 51. — “ Hors ce cas, i] faut, pour les dommages et interéts résultants de Vinexécution des franjadles, se pourvoir devant le juge séculier du domicile de la partie refusante. Lorsque le juge trouve ¡’engagement valable, il condamne la partie qui refuse de Vaccomplir & un somme t\ laquelle il arbitre les dommages et interéts dus a Vautre partie pour l’inexécution de l’engagement. Les depenses que les recherches de mariage ont causées, pendant toute le temps qu’elles ont duré, & celui que se plaint de Vinexécution des fianjailles, et la perte du temps qu’elles lui ont causée, sont les objets les plus ordinaires de ces dommages et interéts. L’affront que souffre la partie á. qui on a manque de foi y puit aussi quelquefois entrer, dans le cas auquel il y aurait lieu de craindre qu’il ne pút nuire b. son établissement avec quelque autre.” — Ibid. n. 53.
In Spain, a promise of future marriage is of such force that, by reason of it, the persons who are betrothed are bound to contract matrimony afterwards, and are prohibited to marry with another; but the canonical and civil impediments, which hinder and dissolve marriages, hinder and dissolve espousals, and their causes are of ecclesiastical cognizance. — Inst. Civ. Law of Spain, by Drs. Jordan De Asso y Del Rio anc *15 Miguel De Manuel y Rodriguez, b. 1, tit. 6. — In Germany, promises of marriage made with certain formalities are actionable; but it seems the modern laws, having regard to the tenderness of the marriage ties and the injustice of constraint, have, in many places there, taken away the means of enforcing, by action, a promise to marry. — Mittermuier, Priv R. 5, b. 2. Abth. § 328. — By the Frederician code, compiled for the states of his majesty the king of Prussia, a promise to marry might be enforced by imprisonment and a very heavy fine. — Code Fred. pt. 1, liv. 2, tit. 2, § 35, 36. — By the code of Fei dinand for the kingdom of the Two Sicilies, a promise of marriage pro duces no civil obligation, unless made before an officer of state in the manner pre scribed, in which case an action may be maintained for the recovery of damages in case of non-performance.— Cod. Due Sicilie, lib. 1, tit. 5, c. 1, n. 148