By the Court.
McCue, J.
[After stating how the cause came before the court, as above.]—Although the testimony is somewhat voluminous, the facts of the case may be readily grouped.
*407 It is not pretended that there was any formal proposal of marriage by defendant, and a like formal acceptance by the plaintiff. The plaintiff says, “He never asked me, in so many words,, to be his wife, but I thought I had a right to expect that he meant it.”
To establish her cause of action, the plaintiff relies upon declarations made, and attentions paid, to her by the defendant, resulting in what has been called an implied contract of marriage. I think the term “implied contract ” is inappropriate to this class of actions ; and, although the mere verbal criticism upon the use of that term could not be of any serious moment, I shall recur to the subject in my review of the charge of the court, to which exception has been taken because of the use of that term.
The plaintiff insists that there was an actual engagement of marriage between her and the defendant; and it will be necessary to review the testimony at some length, in order to appreciate the issues of fact, and of law, involved in the case.
The plaintiff is a single woman about thirty years of age, and a dress-maker by occupation. The defendant is about fifty years of age, a merchant in good standing. Both were members of the same church. The plaintiff had been employed at different times by the defendant’s late wife, and there appears to have been a degree of intimacy between the plaintiff and the defendant’s family, not usual between persons occupying their relative positions. The former Mrs. Earle died in March, 1870 ; and within a few weeks thereafter, the defendant called upon the plaintiff and commenced a series of attentions, which, it is claimed, resulted in an engagement. The defendant took the'plaintiff to ride on several occasions, on one of which, in May, 1870, he stated to plaintiff “that he should marry again after a suitable time “ that he knew what his late wife’s wishes were oh the subject:" he described *408 to her the kind of wife he wanted, in such terms, and in such manner, as seemed significant. A few days after, when again riding out, defendant told the plaintiff his age, and asked her what would be a suitable age in one whom he should marry. Upon her replying in a general way, he urged her “to answer him intuitively, just as if my answer would influence his whole future life.” At a subsequent»ride, after referring to his late wife’s wardrobe, he asked plaintiff what she . “thought of a second wife being willing to wear any of his first wife’s wardrobe he wanted plaintiff to tell him just as she thought, since " he would not go to the trouble of keeping them if they were going to be of no use to him.”
On another occasion, when asking her advice as to a suitable boarding place for himself, he said to her, “some day I expect you to know all my business.”
In the month of June some misunderstanding appears to have arisen between them, and in the course of a conversation relating to this misunderstanding, the plaintiff said to the defendant, “whatever you have said, I would thank no man to marry me, because they felt under obligations for what they had said—you are free ; you have your liberty.”
To this, the defendant only said he was sorry the plaintiff had misunderstood him, but did not explain wherein he had been misunderstood.
The following morning, the defendant, contemplating a visit to the country, asked the plaintiff to write to him. She replied that she " did not think it would be best;” that “he would know his mind better in the fall.”
On the defendant’s return from the country, after an absence of about ten days, he sought the plaintiff at the residence of Mrs. Townsend, in Harrison-street, where she was at work, kissed, her when he first met her, and again when he left, after a visit of an hour, or more.
*409 A few days after, while sitting alone together, defendant told plaintiff he loved her, and asked her if she returned his love, to which she replied that she did.
Later, perhaps in October, the defendant told plaintiff he intended to marry after the year was up, i. e., a year after his wife’s death ; “he said he supposed it would make a great talk, but he did not think he should care, and asked me if I would care, and what I thought about it.”
During this time, say from April to October, the defendant’ s visits to the plaintiff were continuous, occurring, sometimes, twice in a single day ; sometimes prolonged to late hours in the evening.
On October 30,1870, the plaintiff, at the defendant’s request, and, indeed, upon his dictation, addressed to him a letter in which she is made to say, “I know that, at times, your attentions have seemed personal, but I only regard them, and shall continue to regard them, as an evidence of your friendship, and nothing more.” The original letter, in the defendant’s handwriting, was retained by her and produced at the trial. When asked "what explanation the defendant gave for such an extraordinary requirement, the plaintiff testified that the defendant said “ that our folks might have something to say about his coming there, and he did not want them to know there was an understanding so soon.” The defendant gives a different reason for desiring the letter, but the jury may have adopted the plaintiff’s statement as the true one.
About the first of November, the defendant addressed a letter to plaintiff, in which these passages occur :—“ I feel that I have done you a great wrong. . . Let us be good friends, and love each other like brother and sister, and be deeply interested in each other’s welfare. Here I am willing and hope to always stand. Consequently, our conversation and social intercourse should be so guarded, as not to go beyond this. . . . *410 Let us start from this hour as above, asking Him who rules above to rule in our hearts.”
The plaintiff appears to have heard about this time that defendant was visiting some other lady, and reproached him with it, in an interview which took place a few days after the receipt of the above letter.
In the latter part of November, the intimate relations which existed between the parties ceased, and in April, 1871, the defendant re-married.
Other testimony was introduced, in corroboration of the plaintiff’s statment, showing the frequency of the defendant’s visits, and, with this class of proof, plaintiff’s case was closed.
It is only proper to state that, when the defendant was placed on the stand he denied much of what had been related by the plaintiff as having passed between them. He stated that, early in their intimacy, he told her he wanted their relations understood, and his intentions to her ; that he “ esteemed her like a brother, and nothing more.”
Other witnesses were called to show that the plaintiff had made different statements as to her relations with the defendant.
At the close of the plaintiff’s case, the defendant moved to dismiss the complaint on the grounds—
First. That the plaintiff had failed to make out any express promise of marriage.
Secondly. That there was no proof of any promise of marriage between the parties.
Thirdly. That if any such promise, contract, or engagement, had been established, the defendant had been released therefrom by the plaintiff.
The motion was overruled, and, at the close of the case, was repeated, and again overruled.
The points thus made present really all the questions in the case. One or two exceptions were taken as to the admission of evidence for example, where *411 questions were put as to the defendant’s business standing. The testimony elicited by the questions objected to, was of but little materiality, and cannot, possibly, have prejudiced the defendant, or in any way affected the result.
It is sufficient to say, in review of the various requests and exceptions, that they all turn upon the simple propositions—
1. That there was no express promise of marriage, in so many words.
2. That without such express promise no action will lie.
3. That, even if there had been any promise, the plaintiff’s letter of November 29,1870, had, “ as matter of law,” released the defendant.
The answer of the defendant contained a general denial only, and did not set up a release. It is well settled that a release cannot be given in evidence unless properly pleaded:
But the plaintiff’s letter of November 29, 1870, which is retied on, “as a release, as matter of law,” cannot be construed as a dismissal of defendant, or refusal on the part of the plaintiff to marry him. Its language admits of no such interpretation. It was the natural expression of indignation at the manner in which she had been treated by him. The court was, therefore, correct in refusing to charge as requested. The court, however, did instruct the jury to take it into consideration as one of the facts in the case, and that was all the defendant was entitled to ask.
I have been very much aided in the examination of this case, by the full, interesting, able, and carefully prepared brief submitted on behalf of the appellant, and by the fair presentation, on each side, of the principal questions, on the argument.
It is claimed that the court erred in its charge that the contract for the breach of which damages were *412 sought to be recovered, “need not be express,” but might be either “express or implied.”
If, by this, it was intended to instruct the jury that the law implied an obligation on the part of the defendant to marry the plaintiff, because of his attentions to her, the exception would, undoubtedly, be a good one, as the law implies no such contract.
When A. employs B. to do work and labor for him, the law imposes upon A. the natural consequence of his act, to wit, the obligation to pay for the services rendered. The law steps in, and in the absence of any express contract to pay, implies a contract.
To entitle the plaintiff, however, to recover in this action, it is necessary to establish a mutual engagement, a promise made and accepted, as an actual contract. This promise or contract, may be express, that is, made in formal terms, or it may be established by circumstances. The word “implied” should have reference to the kind of proof, the manner of establishing the main fact, namely, the promise or contract, and not to the contract itself,' as in the instance above suggested.
It is impossible to read the entire charge without perceiving that the expression “implied contract” was used in this sense, and not otherwise; the word implied was used as opposed to the word express, and with reference to a contract other than that made in spoken or written words. And, as if to guard against any misconception, the plaintiff’s case was stated to depend upon the existence of a contract mutually made and understood by the parties.
Thus, the learned judge said to the jury, that “in this particular case there must be a contract, an engagement to marry, and there must be evidence to justify you in finding that such engagement existed, and existed as a matter of fact; that it was mutual, the concurrent wish, purpose, and determination of both, or the plaintiff cannot recover.” . . “If all the cir- *413 cum stances, taken together—words, attentions, demonstrations, more or less earnest, assiduous, and affectionate, amounted to a declaration of an intent to marry her, to an assurance that that was what he sought, was his conclusion,—if he intentionally led her to so understand it, and she, in response, accepted that declaration ; if there was a meeting of minds on that, as an engagement between them to marry, the implied contract necessary to sustain the action has been proved.” And again, “If you find otherwise, that there was no meeting of minds on that subject, as an engagement, then the implied contract does not exist, and you will find for the defendant.” And, yet again, “ If the facts and circumstances are sufficiently full and significant to amount to an engagement, were they, or could they be articulate, the spirit of the law supplies the lacking speech.” And, finally, “If you do not, upon the facts and circumstances, find a mutual engagement to marry, within the rule stated, you will find for the defendant; but if you find, upon all the proofs, that there was this mutual understanding and contract between them, that meeting of minds and determination, you will fix the damages under the rule which I have suggested.”
It is evident, from the quotations, that the term “implied contract” was used in contradistinction to an express contract (the latter put as one stated in words, or in writing), and that it was used throughout in reference to the mode and manner of proof only. The charge, in its terms and in its spirit, kept steadily in view of the jury the point that the plaintiff was bound to establish, to their satisfaction, the fact that there was this actual and mutual understanding and engagement, the meeting of the minds of the parties as to their determination to marry,—or, failing in this, that the defendant was entitled to a verdict. By the term “implied contract,” as used by the court, was intended a contract inferred by - and between the *414 parties, wherein the mind of each was made manifest to the other by facts and circumstances which each understood, and which resulted in that meeting of minds which the law defines to be the essence of all contracts, and without which no express contract can exist.
I think the charge placed the issues in the case before the jury fairly and prudently and that the exceptions thereto are not well taken.
The doctrine of the charge was that the contract to marry must have been actually made, but that it might be proved by facts and circumstances. This further appeared in connection with the requests to charge. On being requested to charge that evidence of acts could only be considered to establish that such promise was expressly made, the court refused by reason of the word expressly being contained in the request, that word being understood to mean the formal utterance of certain words, but that "if that word be not limited to such meaning, the court accepted the proposition involved in the request as correct,” adding that “there must have been a contract or promise sufficiently disclosed or expressed to fix the fact that they were to marry, as clearly as if put in formal words.”
But I understand defendant’s counsel to insist that the rule which permitted proof of the contract by circumstantial, in the absence of direct or express evidence, was intended to apply, ex necessitate rel, to the condition of the law as it was before parties were allowed to be witnesses. This does not seem to be a satisfactory explanation for the rule adopted by the courts, since a promise of marriage was not the only contract which could be thus established. The practice had its origin rather in the nature of the contract itself ; for engagements of marriage are frequently entered into without that deliberation and formality which characterize .other important transactions. As was well said by Chief Justice Parker, in the case of Wightman *415 v. Coates (15 Mass. 1): “ A necessity" to prove an express promise would imply a state of public manners by no means desirable; that young persons of different sexes, instead of having their mutual engagement inferred from a course of devoted attention and apparently exclusive attachment, which is now the common evidence, should be obliged, before they consider themselves bound, to call witnesses or execute instruments under hand and seal, would be destructive of that chaste and modest intercourse which is the pride of our country, and a boldness of manners would probably succeed, by no means friendly to the character of the sex, or tlie interests of society” (See also, 3 Salk., 16).
Indeed, it has been long considered that, when, in an action of this kind, the plaintiff was a woman, it was not necessary to aver, or prove, an offer by her. “ The modesty of the sex is considered by the common law, ’ ’ says Lord Coke. " It can hardly be expected that a lady should say to a gentleman, ' I am ready to marry you ; pray, marry me.’ ”
If it was ever proper to infer a promise from the circumstances which usually accompany such a relation, it is equally so now. The statute permitting-the examination of the parties is a new rule of evidence only. The law still remains, that there must exist a promise or mutual engagement; but the proof of this is now made easier by allowing the parties to testify. The law has permitted the promise of marriage to be proven by facts and circumstances, not because the parties to the contract were not permitted to be witnesses, but because, in the nature of the contract itself, resort to such proof became necessary. It was not ordinarily to be established as other contracts are.
The rule is now too well established to make it necessary to refer to authorities in support of the proposition that neither the particular words, or time, or *416 manner of the promise need be proved: that the engagement may be inferred from circumstances (2 Pars. on Cont., vol. 1, bk. 3, ch. xi).
As matter of convenience I refer to an article in the Albany Law Journal, of September 7, 1872 (vol. 6, No. 10), which contains a full and learned review of the authorities, both in England and in this country.
In illustrating the distinction between the contract of lovers made by the verbal request to marry, and a contract implied by and between them to their mutual satisfaction, from the facts and circumstances characterizing their intercourse, Judge Neilson told the jury in reference to the latter form, ‘ ‘ that this contract, or engagement can be made without such words.” To that ruling exception was taken- by the defendant’s counsel, the proposition then not, perhaps, seeming to have, in that very form, the sanction of a prior adjudication. It was, however, obviously an element of the rule of law that such an engagement may be established by, and be inferred from the facts and circumstances.
' But, since the trial of this case, the point under discussion has received the attention of the Irish exchequer, in full bench, and Ch. Baron Pigot, in delivering the opinion of the court, says, “Conduct, demeanor, the behavior of parties toward each other, might constitute proof from which the contract might be inferred; a promise to marry may be made without words” (See The Weekly Reporter, London, Vol. XX., No. 34, p. 752).
It will be observed also, that this language was used in a case under the statute of 31 and 31 Victoria, 68, in which the parties were permitted to be witnesses, and in which the plaintiff was examined and testified as to the promise. The defendant (the man), denied the promise, but the court permitted the plaintiff to introduce facts and circumstances to corroborate her, and *417 establish the promise. Without such facts and circumstances, under the statute there could be no recovery. Therefore, those facts and circumstances, in effect, established the promise or contract of marriage. In the present case, while the plaintiff did not testify that any formal promise was made, yet she says, “He never asked me, in so many words, to be his wife, but I thought I had a right to expect he meant it.” Was it not entirely competent, then, to introduce facts and circumstances to show that he did mean her to understand he desired her to be his wife ? If these facts and circumstances were sufficient, then the promise on the part of the defendant was established.
The proposition that such a contract may be made without words, if not so immediately involved in that case as in this, is thus stated, by a court of high authority, as a mere elementary and well accepted principle, and the opinion of the chief baron is entitled to great consideration.
There remain only two further questions to consider—
1. Whether, under the testimony, the jury were justified in finding that there was a promise, or engagement.
2. Whether the damages awarded were excessive.
Assuming, then, as matter of law, that a promise of marriage may exist without formal words, we cannot say that there was not sufficient evidence to sustain the verdict. In view of all that had, up to that time, transpired between the parties, the jury might well have attached great importance to a conversation testified to by the plaintiff in the following language: “He said he intended to marry after the year was up: he said he supposed it would make a great talk, but he did not think he should care, and asked me if I would care, and what I thought about it.” It would be irreconcilable with any other idea than that of an existing engage *418 ment to-marry, that he should ask her whether she should care if the marriage excited talk. Why should she care unless she was to be the other party to the marriage ? The jury probably regarded that as evidence fixing the time when the engagement was to be consummated. It would seem from this, as from other proofs, that the defendant had great solicitude about the opinion of others as to the propriety of entertaining the project of marriage so soon after his wife’s death; “he did not want them to think there was an understanding so soon.” Understanding as to what ? But I need not illustrate further.
The determination of the jury on the question of fact should not be lightly interfered with. As was said by Ch. Baron Pigot, in the case above cited, “This is one of those peculiar cases in which, were I doubtful, I yet would act, not on my own, but on the judgment of the jury.”
' The same reasoning will apply to the question of damages.
The plaintiff was in humble circumstances, earning her living as a dressmaker; the defendant was a merchant in good credit. His style of living was that of affluence (as compared with hers), and the jury had a right to take into account, not only the injury done to her feelings, but also the pecuniary damages sustained by her loss of the marriage with the defendant (30 N. Y. 285; 42 Id. 478).
For these reasons, the judgment and order appealed from should be affirmed, with costs.
Thompson, J., dissented from the above opinion.
Judgment affirmed, with costs.